**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROOFERS LOCAL 149 PENSION FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MYLAN, N.V., HEATHER BRESCH, and ROBERT J. COURY,<br><br>Defendants. | Case No. :<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED ELECTRONICALLY** |

Plaintiff Roofers Local 149 Pension Fund ("Plaintiff"), by and through its undersigned counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are based upon personal knowledge. Plaintiff's information and belief are based upon, among other things, Plaintiff's counsel's investigation, which included, without limitation: (a) review and analysis of filings made by Mylan, Inc. ("Old Mylan") with the Securities and Exchange Commission (the "SEC"); (b) review and analysis of filings made by Mylan N.V. ("New Mylan") with the SEC; (c) review and analysis of press releases, public statements, news articles, and other public information concerning a merger between Old Mylan and a subsidiary of Abbot Laboratories ("Abbot Labs") that resulted in the formation of New Mylan, a corporation established under the laws of the Netherlands; and (d) review and analysis of press releases, public statements, news articles, and other public information regarding an acquisition proposal for New Mylan by Teva Pharmaceutical Industries N. V. ("Teva").

Plaintiff believes that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery. Many of the facts supporting the

allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.

## SUMMARY OF THE ACTION

1.      This case arises because the board of directors of Old Mylan, a Pennsylvania corporation, convinced its shareholders to approve a "Tax Inversion" transaction on the basis of purported tax benefits.  However, in seeking shareholder approval for the Tax Inversion, the Director Defendants concealed and obscured the fact that they would personally benefit by making New Mylan effectively takeover proof and thus allowing themselves to continually perpetuate themselves in office as long as they wish.  Moreover, the Director Defendants repeatedly assured the Company's shareholders that shares of New Mylan would be traded on the NASDAQ Global Select Market ("NASDAQ"), and the surviving corporation would abide and be bound by the NASDAQ listing rules, just as Old Mylan was.

2.      The Director Defendants' representation that New Mylan would abide by the NASDAQ listing rules, however, was a sham.  NASDAQ's listing rules require that shareholders be allowed to vote to approve any transaction that would result in a change of control.  Nonetheless, on April 3, 2015, just five weeks after the Tax Inversion closed, New Mylan's Board of Directors announced that they had, without any prior shareholder approval, issued a "Call Option" to a specially-created Dutch foundation called Stichting Preferred Shares Mylan (the "Stichting") that, if exercised, will allow the Stichting to acquire sufficient preferred shares of New Mylan to give it control of New Mylan's voting stock, thereby depriving shareholders of all voting power (also called a "Dutch poison pill").  This constitutes a clear change of control and required a prior shareholder vote under NASDAQ's listing rules.

2

3.      When Old Mylan's shareholders approved the Tax Inversion, they were not adequately informed that New Mylan would be a company that was immune from being acquired. They only realized this because the Director Defendants are using the Stichting in bad faith to prevent New Mylan's shareholders from acting to accept an acquisition proposal from Teva that would provide them with a 48.3% premium to the unaffected share price of New Mylan.  This is an egregious use of the corporate machinery to deny shareholders an opportunity to sell their company at a premium.

4.      Although the capital structure of New Mylan approved by the shareholders of Old Mylan in connection with the Tax Inversion included Preferred Shares that could be used for a Dutch poison pill, NASDAQ's listing rules required specific shareholder approval prior to the actual issuance of those shares or any option to acquire them.  In seeking approval for the Tax Inversion, the Director Defendants did not seek shareholder approval for the creation of any Dutch poison pill, and by approving the Tax Inversion, shareholders of Old Mylan did not authorize the issuance of securities that would deprive them of voting control of the surviving corporation. Moreover, despite vague references to the possibility of implementing a Dutch Poison Pill in the future, the Director Defendants failed to adequately disclose that they were planning on implementing the device as soon as any third party threatened their control of New Mylan.

5.      Accordingly, the Director Defendants breached their fiduciary duties to the shareholders of Old Mylan by (a) misrepresenting that, in seeking approval for the Tax Inversion, the Director Defendants knew — but failed to disclose — that they had already agreed to incorporate a foundation and grant it such a call option at the time they solicited the vote of Old Mylan shareholders in favor of the Tax Inversion; and/or (b) falsely representing that New Mylan

would be bound by and would comply with NASDAQ's listing rules, which required specific shareholder approval prior to the issuance of securities that would result in a change of control.

6.    In failing to disclose this material information, Defendants breached their fiduciary duties to Old Mylan shareholders.  As a consequence of this breach of duty, Old Mylan shareholders were deprived of their chance to cast a fully-informed vote on the Tax Inversion. Plaintiff seeks a declaration that the grant of the call option to the Stichting was not authorized in conformity with applicable law, and therefore is invalid.  Alternatively, the vote should be rescinded or, if declaratory relief is unavailable, shareholders of Old Mylan should be awarded damages.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 in that Plaintiff and Defendants are citizens of different states and/or countries and the matter in controversy exceeds $75,000.00.

8.    This action is not brought collusively to confer jurisdiction on this Court that it would not otherwise have.

9.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  Moreover, Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.  Old Mylan was, until the time of the Tax Inversion, a Pennsylvania corporation headquartered in Canonsburg, Pennsylvania, and the Director Defendants were the CEO and the Executive Chairman of Old Mylan, and, following the Tax Inversion, New Mylan.

10.     Each Defendant has minimum contacts with this district as each has entered into contracts in the district, or has frequently traveled to the district on Old Mylan business, or has authorized acts and actions that have had a sufficient impact in the district or on Old Mylan's shareholders and investors residing here to justify the exercise of jurisdiction.

## THE PARTIES

11.     Plaintiff Roofers Local 149 Pension Fund ("Plaintiff") was a holder of Old Mylan common stock at all relevant times.  Those shares were converted into shares of New Mylan in connection with the Tax Inversion.  Plaintiff continues to own those shares of New Mylan. Plaintiff is a citizen of Michigan.

12.     Defendant Heather Bresch ("Bresch") was, at all relevant times hereto, the Chief Executive Officer ("CEO") and member of the Board of Directors of Old Mylan; and currently is the CEO and a director of New Mylan.  Upon information and belief, Bresch is a citizen of Pennsylvania.

13.     Defendant Robert J. Coury ("Coury") was, at all relevant times hereto, a member of the Board of Directors of Old Mylan, and currently is a director of New Mylan.  Upon information and belief, Coury is a citizen of Pennsylvania.

14.     Defendants Bresch and Coury were directors of Old Mylan at the time of the Tax Inversion, and are referred to herein as the "Director Defendants."

15.     Defendant Mylan N.V. ("New Mylan") is a public limited liability company organized and existing under the laws of the Netherlands, with its principal place of business at Albany Gate, Darkes Lane, Potters Bar, Herts EN6 1AG, United Kingdom.  New Mylan was incorporated on July 7, 2014, as New Moon B.V. ("New Moon"), a private limited liability company organized under the laws of the Netherlands, for the purpose of holding Old Mylan and the Abbott Business.  Upon consummation of the Tax Inversion, New Moon was renamed Mylan

5

N.V.  Pursuant to the Tax Inversion, New Mylan is the successor in interest, and assumed all the rights, assets, liabilities and obligations of Old Mylan.

## RELEVANT NON-PARTIES

16.     Mylan, Inc. ("Old Mylan") was, until the time of the Tax Inversion, a Pennsylvania corporation headquartered at 1000 Mylan Boulevard, Canonsburg, Pennsylvania 15317.  Old Mylan was a global pharmaceutical company that, through its subsidiaries, developed, licensed, manufactured, marketed, and distributed generic, branded generic, and specialty pharmaceuticals. Old Mylan common stock was traded on the NASDAQ Stock Market under the symbol "MYL."

17.     Abbott Labs is a global healthcare company headquartered at 100 Abbott Park Road, Abbott Park, Illinois.  Prior to the Tax Inversion, Abbott's non-U.S. developed markets specialty and branded generics business (the "Abbott Business") operated in Canada, Japan, Australia, New Zealand, and Europe.  The Abbott Business included manufacturing facilities in France and Japan, and its product line included a variety of specialty and branded generic pharmaceuticals that covered a range of therapeutic categories in an extensive array of dosage forms and delivery systems.

## FACTUAL BACKGROUND

**A.     Old Mylan Completes a Tax Inversion and Makes Certain Disclosures to Its Shareholders**

18.     In recent years, certain corporations domiciled in the United States have sought to lessen or eliminate their tax obligations to our country by reincorporating overseas through a complex transaction called a "Tax Inversion." In an inversion, the U.S. corporation seeking to reincorporate merges with and into a corporation organized under the laws of a foreign country — one with a more favorable tax structure — and the shares of the U.S. corporation are cancelled and exchanged for shares in the newly-created (and usually identically named) foreign entity.

19.     President Barack Obama has called the practice "unpatriotic,"[1] and has urged Congress to close the loophole in the U.S. tax laws that make inversions possible.  One regulation limiting the tax benefits of inversions provides that the surviving foreign corporation nonetheless will be treated as being domiciled domestically if the ownership of the original U.S. corporation makes up 80% or more of the surviving foreign corporation.  26 C.F.R. § 1.7874-1.  As a result, one strategy adopted by U.S. corporations seeking to effect a tax inversion has been to include in the merger a separate corporation with different ownership such that the shareholders of the original U.S. corporation will control less than 80% of the surviving foreign entity.

20.     Mylan was one such corporation.  On July 14, 2014, the Board of Directors of Old Mylan announced that the Company had entered into a merger agreement with Abbott Labs, pursuant to which Old Mylan would combine with certain non-U.S. businesses of Abbott Labs to form New Mylan, a company established under the laws of the Netherlands.  Specifically, pursuant to an Amended and Restated Business Transfer Agreement and Plan of Merger with New Mylan, Moon of PA Inc. ("Merger Sub"), and Abbott Labs (the "Merger Agreement"), New Mylan would

---

[1] President Barack Obama's weekly address from July 26, 2014:

> "... Even as corporate profits are as high as ever, a small but growing group of big corporations are fleeing the country to get out of paying taxes. They're keeping most of their business inside the United States, but they're basically renouncing their citizenship and declaring that they're based somewhere else, just to avoid paying their fair share. ... The best way to level the playing field is through tax reform that lowers the corporate tax rate, closes wasteful loopholes, and simplifies the tax code for everybody. But stopping companies from renouncing their citizenship just to get out of paying their fair share of taxes is something that cannot wait.  That's why, in my budget earlier this year, I proposed closing this unpatriotic tax loophole for good.  Democrats in Congress have advanced proposals that would do the same thing.  A couple Republicans have indicated they want to address this too, and I hope more join us."

acquire Old Mylan and the Abbott Business, with New Mylan being the surviving entity.  In order

to stay below the 80% threshold to effect a Tax Inversion, Old Mylan shareholders would own

approximately 78% of New Mylan after the Tax Inversion, with affiliates of Abbott owning the

remaining approximately 22%.[2]  New Mylan's ordinary shares were to be listed on the NASDAQ

Global Select Market under the ticker symbol "MYL."

21.     On December 24, 2014, Old Mylan and New Mylan filed a proxy statement (the

"Inversion Proxy") through which they solicited the approval of Old Mylan shareholders to effect

the Tax Inversion.  In the Inversion Proxy, Old Mylan, New Mylan, and the Director Defendants

made certain disclosures to Old Mylan's shareholders that would soon prove to be materially

misleading and deficient.

22.     First, in seeking approval for the Tax Inversion, the directors of Old Mylan

repeatedly assured investors in the Inversion Proxy that, despite reincorporating to the

Netherlands, stock in the surviving corporation would continue to be traded on NASDAQ, and the

Company would continue to be bound by that exchange's listing rules:

> If the [Tax Inversion] is completed, each share of [Old] Mylan common stock
> issued and outstanding immediately prior to the effective time of the [Tax
> Inversion] (the "effective time") will be cancelled and automatically converted into
> and become the right to receive one New Mylan ordinary share.  The one-for-one
> ratio is fixed, and, as a result, the number of New Mylan ordinary shares received
> by the [Old] Mylan shareholders in the [Tax Inversion] will not fluctuate based on
> the market price of a share of [Old] Mylan common stock prior to the [Tax
> Inversion].  The New Mylan ordinary shares will be registered with the SEC and
> are expected to be listed on the NASDAQ Global Select Market ("NASDAQ")
> under the symbol "MYL."

---

[2] This ownership split was agreed upon in an amended Merger Agreement dated November 4, 2014.

23.     In addition, the Inversion Proxy represented that one condition to the consummation of the Tax Inversion was that New Mylan shares were approved for listing on NASDAQ and that:

> For so long as its shares will be listed on NASDAQ, New Mylan will be required to meet certain requirements relating to ongoing communication and disclosure to New Mylan shareholders, including a requirement to make any annual report filed with the SEC available on or through New Mylan's website and to comply with the 'prompt disclosure' requirement of NASDAQ with respect to earnings and dividend announcements, combination transactions, stock splits, major management changes and any substantive items of an unusual or non-recurrent nature. ***Issuers listing shares on NASDAQ must also meet certain corporate governance standards, such as those relating to annual meetings, board independence, the formation and composition of nominating/corporate governance, compensation and audit committees, and approval by New Mylan shareholders of certain transactions.*** (emphasis added).

24.     Furthermore, the Inversion Proxy expressly states that following the consummation of the Tax Inversion, "New Mylan will be subject to certain disclosure obligations under Dutch and U.S. law ***and the rules of NASDAQ***." (emphasis added).

25.     Finally, there are other statements that show New Mylan intended to be governed by NASDAQ regulations.  For example:

- When discussing the rollover of Old Mylan's long term incentive plan, the Inversion Proxy states that New Mylan will be able to use the plan to continue "to grant equity-based and other awards, ***to the extent permissible by applicable laws and NASDAQ regulations***[;]"

- In discussing whether the directors who would sit on the initial New Mylan Board would be independent, the Inversion Proxy evaluates each expected director under the applicable NASDAQ standards;

- In discussing whether New Mylan will be able to buy its own shares in order to transfer them to employees under an equity incentive plan, the Inversion Proxy

states that the NASDAQ rules do not require prior shareholder approval before taking such action; and

- The Inversion Proxy stated that New Mylan will adopt an insider trading policy, "*[i]n connection with its listing on NASDAQ*. (emphasis added).

26.     Thus, it is clear that in approving the Tax Inversion based on the Inversion Proxy, Old Mylan's shareholders had an expectancy that New Mylan's shares would be traded on NASDAQ and that New Mylan would comply with NASDAQ rules and regulations.  As shown below, these disclosures were false and misleading and the Director Defendants have frustrated the expectancy of Old Mylan's shareholders.

27.     Additionally, the Inversion Proxy contains vague disclosures stating that New Mylan may, hypothetically in the future, utilize an obscure takeover defense available under Dutch law often referred to as a stichting.

28.     To explain, Dutch law permits the formation of a Dutch foundation (a stichting), to take voting control in Dutch entities.  The stichting device involves a company granting an "independent" foundation a call-option to buy preferred shares that, if exercised, allows the foundation to take control of the company for the purposes of protecting the interests of other Dutch stakeholders.  According to *The Wall Street Journal*, a stichting was an obscure legal entity used "primarily by Dutch charities," and then used during World War II to transfer "ownership to stichtings based in the Dutch Antilles in the Caribbean to protect assets from the German occupiers[.]"  New Mylan is now using this obscure legal device as a "Dutch poison pill" to block any action by potential acquirers or activist shareholders supporting an acquisition.   Unlike American poison pills, which are limited in scope and duration and subject to a board decision to revoke the pill (including the decision of a new board voted in by shareholders), the stichting

device puts decisions on the deal, or any deal, *exclusively* in the hands of the foundation, bypassing the board.

29.     A stichting is an independent entity from New Mylan and the Board.  It is not accountable to New Mylan's shareholders, or even the Board.  Once it exercises its call option, a board does not have the power to cancel or redeem the stichting's preferred shares.  Therefore, regardless of how great an offer is for a company's shareholders, due to the issuance of a call option, they are blocked from accepting such offer unless the stichting deems it appropriate.

30.     In soliciting shareholder approval for the Tax Inversion, the Director Defendants disclosed that a Dutch poison pill theoretically would be available as an anti-takeover defense to New Mylan.  The Inversion Proxy's Risk Factors included the following:

> ***PROVISIONS IN NEW MYLAN'S GOVERNANCE ARRANGEMENTS OR THAT ARE OTHERWISE AVAILABLE UNDER DUTCH LAW COULD DISCOURAGE, DELAY, OR PREVENT A CHANGE IN CONTROL OF NEW MYLAN AND MAY AFFECT THE MARKET PRICE OF NEW MYLAN ORDINARY SHARES.***
>
> Some provisions of New Mylan's governance arrangements or that are otherwise available under Dutch law, such as the ability to grant to a foundation (stichting) (a "Dutch foundation") a call option to acquire preferred shares to preserve the long-term value of New Mylan, may discourage, delay, or prevent a change in control of New Mylan, even if such a change in control is sought by New Mylan shareholders.

 (emphasis in original).

31.     The Inversion Proxy further explained:

> Under Dutch law, various protective measures are permissible.  New Mylan's governance arrangements include several provisions that may have the effect of making a takeover more difficult or less attractive, including:
>
> - the power of the New Mylan Board to issue to a Dutch foundation a call option to acquire preferred shares that, if exercised (see "—Rights Agreement/Preferred Shares"), could delay a potential takeover or allow New Mylan to further discuss with a potential acquirer its future plans for New Mylan as well as to search for strategic alternatives; and

- requirements that certain matters, including the amendment of the New Mylan Articles (see "—Amendment of Governing Documents" above), may only be brought to the General Meeting for a vote upon a proposal by the New Mylan Board.

\*       \*       \*

Dutch law permits a company to issue to a Dutch foundation a call option to acquire preferred shares that, if exercised, could delay a potential takeover or allow such company to further discuss with a potential acquiror its future plans for the company as well as to search for strategic alternatives. ***New Mylan has not issued a call option to a Dutch foundation for New Mylan preferred shares***. A Dutch foundation's governing documents generally provide that the call option will be exercised if the Dutch foundation determines such exercise to be (i) in the best interests of the company and the business conducted by it and (ii) necessary to maintain the status quo and/or to enable the company's management to explore alternative scenarios, By exercising the option to acquire a company's preferred shares, a Dutch foundation temporarily dilutes the voting rights of the company's holders of ordinary shares, thereby preventing the holders of ordinary shares from exercising control while the preferred shares remain outstanding. The number of preferred shares held by a Dutch foundation is limited so that, after giving effect to the exercise of a call option, it will not exceed the number of outstanding ordinary shares of the company at such time. (emphasis added).

These disclosures merely state that the creation of a stichting is a mere hypothetical possibility. Moreover, they downplay the effect of creating a stichting and state that it would only temporarily assume voting control over the corporation. As explained below, like the disclosures concerning compliance with NASDAQ rules, these disclosures were also materially misleading.

32.     Based on the disclosures contained in the Inversion Proxy, Old Mylan shareholders approved the Tax Inversion on January 29, 2015 and it closed on February 27, 2015. Since the vote to approve the Tax Inversion was based on materially deficient disclosures, the vote was invalid.

**B.     The Director Defendants Immediately Erect Defenses to Protect Their Positions**

33.     Almost immediately after the consummation of the Tax Inversion, in mid-March 2015, rumors began circulating in the financial press that Teva was preparing to make an offer to acquire 100% of New Mylan. Eventually, on April 21, 2015, Teva publicly offered to acquire

Mylan for cash and stock valued at $82 per share, or approximately $43 billion in total. This represented a huge 48.3% premium to New Mylan's unaffected share price.

34.     The Director Defendants were not prepared to relinquish their control over New Mylan, so they took prompt action to defend against any forthcoming proposal from Teva, no matter how attractive it might be to New Mylan's shareholders.

35.     On April 3, 2015, despite the Inversion Proxy's implication that this was only a remote possibility, just five weeks after the Tax Inversion closed, shortly following market speculation of an offer from Teva, New Mylan announced that it had created the Stichting and entered into a "Call Option Agreement" with it. Under the Call Option Agreement, the Stichting was granted an indefinite option to acquire, for nominal consideration, New Mylan preferred shares in an amount equal to the number of New Mylan ordinary shares issued. Just like New Mylan ordinary shares, each New Mylan preferred share has the right to one vote in each matter presented to New Mylan shareholders.

36.     Thus, the Call Option gives the Stichting the power to acquire 50% of the voting power of New Mylan, granting it the absolute right to block any offer to buy New Mylan.[3] This is an extraordinary defense that has no counterpart in American law and is totally inconsistent with the reasonable expectations of American investors.

37.     Defendants had known about Teva's potential interest prior to issuing the Inversion Proxy and New Mylan has already set about using the Call Option to its advantage. As a Sanford C. Bernstein & Co. analyst report has noted, New Mylan "could not be clearer" that it is not

---

[3] While the Stichting removes voting control from New Mylan's shareholders, it does not affect the Direct Defendants' operational control over the Company. Moreover, since only the Board has the power to nominate directors under New Mylan's organization documents, the Stichting cannot take action to replace any of the Director Defendants.

working primarily for its shareholders in seeking to fend off Teva.  New Mylan has explicitly noted in regulatory filings that under Dutch law, directors' duties extend to all stakeholders including "shareholders, creditors, employees, customers, and suppliers."  Moreover, Steven Davidoff Solomon, the Professor of Law at the University of California, Berkeley School of Law, who writes as the "Deal Professor" for *The New York Times*, wrote that a recent statement issued by the Stichting "comes off as biased toward Mylan's management and the Perrigo bid.  It does not seem to be issued by a group of trustees that is supposed to look out for the best interests of the company."  Simply put, the Call Option allows the Stichting to put the interests of other New Mylan stakeholders above the interests of its common stockholders.

38.     In addition to setting up the Stichting and issuing the Call Option, the director defendants are also attempting to acquire Perrigo Company plc ("Perrigo") as another defense to Teva's acquisition attempt.  On April 8, 2015, New Mylan publicly announced a proposal to acquire Perrigo for cash and stock worth $205 per Perrigo share, or approximately $29 billion.  On April 29, New Mylan raised this offer to $232.23 per Perrigo share, or over $34 billion.  Teva has repeatedly said that if New Mylan completed an acquisition of Perrigo, it would withdraw its offer.  Nonetheless, the Director Defendants are pushing ahead with their proposed acquisition of Perrigo and have filed preliminary proxy solicitation materials for a shareholder vote on such a deal.

39.     The Perrigo acquisition, if approved, will result directly from the unlawful and inadequately approved Stichting and related Call Option.  Moreover, the Stichting could exercise the Call Option and push through the Perrigo deal even if New Mylan's shareholders do not support it.  Accordingly, a declaration is appropriate to make clear that the Stichting was not properly created and did not properly obtain the blocking right that is shielding the Perrigo deal while preventing stockholders from accepting the Teva offer.

14

40.     In setting up the Stichting and attempting to acquire Perrigo, the Director Defendants are acting in bad faith to entrench themselves in office and deny New Mylan's shareholders an opportunity to effectuate a sale to Teva that offers them a 48.3% premium to the unaffected value of their shares.

### C.     The Inversion Proxy Was False and Misleading

41.     In claiming that New Mylan would comply with NASDAQ rules and implying that the creation of a Stichting was a mere possibility, the Inversion Proxy was false and misleading

42.     Since 1976, Mylan has been publicly traded on NASDAQ, and has been subject to NASDAQ's listing rules.  Consistently in its Annual Reports filed with the SEC on Form 10-K for example, Old Mylan repeatedly assured investors that:

> Effective internal controls are necessary for Mylan to provide reasonable assurance with respect to its financial reports.  We spend a substantial amount of management and other employee time and resources to comply with laws, regulations and standards relating to corporate governance and public disclosure.  In the U.S., such regulations include the Sarbanes-Oxley Act of 2002, SEC regulations and the NASDAQ listing standards.

43.     The Inversion Proxy repeatedly stated or implied that New Mylan would continue to trade on NASDAQ and would comply with all applicable NASDAQ rules.  Nonetheless, barely a month after consummation of the Tax Inversion, the Director Defendants flouted NASDAQ rules and turned over voting control of the Company to an independent entity.

44.     NASDAQ Rule 5635(b) provides unambiguously that "Shareholder approval is required prior to the issuance of securities when the issuance or potential issuance will result in a change of control of the Company."

45.     In addition, NASDAQ has published on its website the following FAQ to explain what constitutes a "change of control" for purposes of Rule 5635:

> FAQ - What is a change of control for purposes of the shareholder approval requirement of Listing Rule 5635(b)?

Generally, a change of control would occur when, as a result of the issuance, an investor or a group would own, or have the right to acquire, 20% or more of the outstanding shares of common stock or voting power and such ownership or voting power would be the largest ownership position. However, NASDAQ will consider all facts and circumstances concerning a transaction, including whether there are any other relationships or agreements between the company and the investor or group.

46.     Therefore, the Inversion Proxy is false and misleading because despite claiming New Mylan would comply with NASDAQ rules, it promptly flouted rule 5635 and engaged in a transaction where the potential issuance of securities would result in a change of control with first receiving shareholder approval.

47.     The issuance of the Call Option to the Stichting unquestionably required a positive shareholder vote prior to the issuance. As explained above, the Call Option gives the Stichting the right to acquire preferred shares that will give it 50% of the voting power of New Mylan. Thus, the Stichting alone can decide the outcome of every single matter put to the shareholders for a vote. There is no way to interpret this other than as a change of control. Indeed, even the Inversion Proxy states that if the Stichting exercises its Call Option, it would "prevent[] the holders of ordinary shares from exercising control while the preferred shares remain outstanding."

48.     Therefore, the Director Defendants cannot argue that the granting the Stichting the Call Option was not a change of control under NASDAQ rules. Moreover, the Director Defendants cannot argue that the vote to approve the Tax Inversion satisfies the requirements of NASDAQ Rule 5635(b).

49.     The vote by shareholders of Old Mylan on the Tax Inversion approved a capital structure of New Mylan that included Preferred Shares that *could* be used in a Call Option involving a stichting. The vote to approve the Tax Inversion, however, *did not* specifically approve the *issuance* of any such Preferred Shares. In fact, the Inversion Proxy states that shareholder

proxies were being solicited for three reasons: (i) to approve the Merger Agreement by which the Tax Inversion would be completed; (ii) to approve, on a non-binding advisory basis, certain executive compensation arrangements; and (iii) to approve an adjournment of the shareholder meeting to solicit additional proxies if necessary. None of these three items include approval to issue 50% of New Mylan's voting power to an independent entity.

50.     In fact, as discussed above, by representing that New Mylan would be bound by the NASDAQ listing rules without concurrently disclosing and seeking approval for the *issuance* of the Call Option to the Stichting, the Director Defendants necessarily implied that the vote by shareholders of Old Mylan to approve the Tax Inversion did not constitute approval for the issuance of any Preferred Shares.

51.     Furthermore, according to Professor Davidoff Solomon:

> Mylan's [Inversion Proxy] for that transaction speaks only of the potential formation of a stichting (the trust was set up on April 3, only a few days before Mylan's hostile bid for Perrigo). ***There was no specific vote of shareholders on the stichting, which is presumably what Nasdaq rules require***. Indeed, there are federal rules against bundling proposals in proxies, and they would almost certainly require a separate vote on the creation of the Dutch trust. (emphasis added).

52.     Moreover, a vote by shareholders of Old Mylan to approve the issuance of preferred shares would have been ineffective in any event, as the Call Option was issued by New Mylan. Accordingly, NASDAQ Rule 5635(b) required a separate approval by shareholders of New Mylan prior to the issuance of the Call Option. Nonetheless, to the extent such vote did authorize the issuance of the Call Option, the Inversion Proxy is materially misleading in that it fails to make clear that Old Mylan shareholders would also be voting to give the New Mylan Board the authority to undertake such action.

53.     In addition to containing false and misleading disclosures concerning New Mylan's intention to comply with NASDAQ rules, the Inversion Proxy also misleadingly disclosed that the

creation of a stichting was a mere hypothetical possibility.  The Inversion Proxy said that New Mylan would — *in theory*— be able to adopt certain defensive measures that might make New Mylan a less attractive target for takeovers and that could negatively affect the market price for New Mylan shares going forward.

54.    Although the Inversion Proxy contained generic disclosures about the availability of a Dutch poison pill to New Mylan, the Inversion Proxy did not disclose that as soon as any third party showed any interest in acquiring New Mylan, the Director Defendants would take such drastic measures in order to retain their own positions.  The Inversion Proxy also did not disclose that the Stichting would owe no fiduciary duties to New Mylan's shareholders.

55.    The Director Defendants breached their fiduciary duty of disclosure to Old Mylan shareholders by failing to disclose the material fact that New Mylan *had already agreed* to form a foundation and grant it a call option *before* the shareholders voted on the Tax Inversion.  The Director Defendants' coy disclosure of the fact that New Mylan would have the "theoretical" ability to grant such a call option is insufficient under the facts here and makes the disclosures false and misleading.

56.    By concealing New Mylan's pre-existing commitment to implement a Dutch poison pill, the Director Defendants misrepresented the value of the consideration to be received by Old Mylan shareholders in connection with the Tax Inversion.

57.    Economic studies indicate that U.S. companies with poison pills generally trade at a 6% discount to companies that have not implemented a poison pill.  Therefore, the Director Defendants' efforts to conceal the fact that New Mylan already had committed to implement a Dutch poison pill materially impacted the value of the consideration being offered to shareholders of Old Mylan in the Tax Inversion.  By failing to disclose the full truth about the Call Option, the

Director Defendants deprived the Old Mylan shareholders of the right to cast an informed vote on whether they wanted to hold securities in a company that had a Dutch poison pill in place and that, accordingly, likely would trade at a discount to where it would have traded had it not had such an anti-takeover device in place.

58.     Furthermore, in granting the Call Option to the Stichting, the Director Defendants have deprived New Mylan's shareholders of the opportunity to accept Teva's offer, which provides a 48.3% premium to New Mylan's unaffected stock price.

## CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of itself and all similarly situated former shareholders of Old Mylan, who owned shares of Old Mylan as of December 23, 2014, and were entitled to vote on the Tax Inversion (the "Class"), and a subclass of all members of the Class who received shares of New Mylan in the Merger and continuously owned shares of New Mylan through the April 3, 2015 formation of the Stichting (the "Subclass").

60.     Prosecution of this case as a class action is appropriate under Rule 23 for the following reasons:

a.     The Class and Subclass are so numerous that joinder of all members is impracticable.  The Class and Subclass consist of thousands of shareholders who are scattered throughout the United States.  As of October 29, 2014, there were 374,273,573 outstanding common shares of Old Mylan.

b.     There are questions of law or fact common to the Class and Subclass.  These questions include, *inter alia*: (i) whether the Director Defendants breached their fiduciary duties to the shareholders of Old Mylan; (ii) whether the Inversion Proxy was materially

19

misleading; (iii) whether Defendants breached the representations they made in the Inversion Proxy; (iv) whether the vote on the Tax Inversion was effective; (v) whether shareholder approval was required prior to the issuance by New Mylan of the Call Option; and (vi) whether the vote by shareholders of Old Mylan to approve the Tax Inversion was effective for purposes of approving the issuance of the Call Option as required by NASDAQ Rule 5635(b);

      c.      The claims of Plaintiff are typical of the claims of the Class and Subclass. Plaintiff was a shareholder of Old Mylan on the record date established by the Director Defendants for purposes of obtaining approval for the Tax Inversion. Plaintiff's claims, therefore, are typical of other members of the Class and Subclass. Plaintiff is not subject to any unique claims or defenses by the Director Defendants;

      d.      The attorneys for Plaintiff will adequately represent the interests of the Class and Subclass. Undersigned counsel are experienced class action attorneys with a demonstrated successful history of representing shareholders' interests nationally. Plaintiff's chosen counsel is fully prepared and qualified to represent the interests of the Class and Subclass;

      e.      Plaintiff does not have any conflict of interest that would impair its ability to prosecute this action on behalf of the Class or Subclass;

      f.      Plaintiff and its counsel have adequate financial resources to assure that the interests of the Class and Subclass will be adequately represented and will not be harmed through the prosecution of this action

      g.      The prosecution of separate actions by individual members of the Class or Subclass would create the risk of inconsistent or varying adjudications with respect

20

to individual members of the Class and Subclass, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class and Subclass, which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

h.    Director Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and Subclass; and

i.    The complexities of the issues raised herein and the expense of prosecution are such that they would not support the prosecution of separate actions and in fact render prosecution of individual claims herein economically inefficient.

## COUNT I

### BREACH OF FIDUCIARY DUTY
### (Against the Director Defendants)

61.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

62.    Plaintiff brings this count on behalf of itself and the Class against the Director Defendants for breach of fiduciary duty.

63.    The Director Defendants owed the Class fiduciary duties of due care, good faith, candor and loyalty.  By virtue of their positions as directors of Old Mylan, the Director Defendants had the power to influence and/or cause, and did influence and/or cause, Old Mylan to engage in the practices complained of herein.  Each Director Defendant was required to fully disclose the material circumstances, procedures, and terms of the Tax Inversion so that shareholders of Old Mylan could make a fully informed decision with respect to the Tax Inversion.

64.     The Director Defendants failed to fulfill their fiduciary duties in connection with the Tax Inversion, which resulted in shareholders of Old Mylan being deprived of their opportunity to cast a fully informed vote with respect to the Tax Inversion.  Specifically, in the Inversion Proxy, the Director Defendants misleadingly claimed that New Mylan would comply with NASDAQ regulations and failed to disclose that they intended to issue the Call Option to the Stichting.

65.     As a result of the Director Defendants' breaches of fiduciary duty as set forth above, the Class has been harmed.

## COUNT II

### BREACH OF CONTRACT
### (Against the Director Defendants and Mylan, N.V.)

66.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

67.     Plaintiff brings this count on behalf of itself and the Subclass against New Mylan (as successor in interest to Old Mylan) and the Director Defendants for breach of contract.

68.     Old Mylan and Director Defendants formed a contract with Plaintiff and the other shareholders of Old Mylan in order to accomplish the reincorporation through the Tax Inversion. Specifically, the Director Defendants represented that New Mylan would comply with NASDAQ listing rules, including Rule 5635(b), in exchange for Plaintiff's support for the Tax Inversion. Plaintiff and the other Old Mylan shareholders accepted that offer, and a binding contract was formed.

69.     Plaintiff and the other Subclass members performed their obligations under the contract, *i.e.*, they supported the Tax Inversion, refrained from objecting to the Tax Inversion, and voted in favor of the Tax Inversion.

70.     Through the Tax Inversion, New Mylan accepted all the rights and obligations of Old - Mylan, including the contractual obligations of Old Mylan as described above.

71.     New Mylan and the Director Defendants breached the contract by permitting New Mylan to adopt the Dutch poison pill and issue the Call Option without shareholder approval.

72.     New Mylan's and the Director Defendants' breach of contract has harmed Plaintiff and the Class by depriving them of their right to vote on the issuance of any securities by New Mylan which would result in a change of control.

73.     Plaintiffs and the Subclass have no adequate remedy at law.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A.     Finding the Director Defendants liable for breaching their fiduciary duties to the Class;

B.     Finding that New Mylan and the Director Defendants breached their contractual obligations to the Subclass

C.     Rescinding the vote of shareholders of Old Mylan to approve the Tax Inversion;

D.     Awarding the Class and Subclass compensatory damages, together with pre- and post-judgment interest;

E.     Awarding Plaintiff the costs and disbursements of this action, including attorneys, accountants', and experts' fees; and

F.     Awarding such other and further relief as is just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated:  July 21, 2015.

/s/ Benjamin J. Sweet
Benjamin J. Sweet
Carlson Lynch Sweet & Kilpela, LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: 412-322-9243
Fax: 412-231-0246

Counsel for Plaintiff

OF COUNSEL:

Mark Lebovitch
John Vielandi
BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019
Tel:  212-554-1400
Fax:  212-554-1444

Counsel for Plaintiff